UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 16-10274-RGS

UNITED STATES OF AMERICA

v.

ROBERTO ALICEA, and
HAROLD ESTELA-VAZQUEZ

MEMORANDUM AND ORDER ON
DEFENDANTS' CONSOLIDATED MOTION TO SUPPRESS

July 21, 2017

STEARNS, D.J.

Defendant Roberto Alicea moves to suppress evidence of his involvement in drug trafficking, specifically a locked suitcase containing 22 kilograms of cocaine seized from the hatchback area of his motor vehicle after it was stopped by a Massachusetts State Trooper in East Boston. Alicea asserts an ownership interest and expectation of privacy in the vehicle and its contents and has submitted an affidavit in support of his claims. Defendant Harold Estela-Vazquez also asserts a possessory interest in the suitcase, but has not filed a sworn affidavit. Neither defendant has indicated a willingness to testify at a suppression hearing. A non-evidentiary hearing on the consolidated motion was held on July 11, 2017.

FACTUAL BACKGROUND

Because the search of Alicea's vehicle was conducted without a warrant, the burden falls to the government to prove that the search was

lawful; proof is by a preponderance of the evidence.  *United States v. Matlock*, 415 U.S. 164, 177-178 n.14 (1974).   Based on the verified facts and exhibits offered by way of the affidavits of Homeland Security Special Agent Philip Lavoie and Massachusetts State Police Sgt. Mark Marron, I find as follows.[1]

In July of 2016, a consensual search of an apartment on Hancock Street in Quincy, Massachusetts, conducted by Agent Lavoie, State Police Sgt. Dan LeVangie, and other officers, recovered 37.5 kilograms of cocaine and $57,395 in U.S. currency.  The seizures led to the arrest of Raymond Sanchez, the occupant of the apartment. Following the subsequent arrest by State Police of the confidential informant (CI) in nearby Milton, Massachusetts, on unrelated cocaine charges, the CI asked to speak with investigators in the Sanchez case.   In an ensuing face-to-face interview, the CI told Lavoie and LeVangie that Sanchez had no involvement with the drugs and currency and that he (the CI) took full responsibility for their presence

---

[1] I have relied only on those facts that are undisputed.  While the investigative report of Agent Lavoie (Exhibit 1 of his affidavit) as it appears in the public record is heavily redacted to protect the identity of the confidential informant, I have relied on those portions of the redacted report that have been disclosed to defense counsel (and not the redacted portions made available for *ex parte* inspection by the court).  I agree with the government that publication of the redactions would endanger the life of the confidential informant.  Facts that are disputed by defendant Alicea in his affidavit, I will note in the appropriate context, although these involve only the circumstances surrounding the vehicle stop.

2

in the apartment.

The CI then stated that he had come to Boston six weeks earlier at the direction of the head of a major drug trafficking organization in the Dominican Republic for whom on seven prior occasions he had swallowed and smuggled pellets of narcotics into the United States. According to the CI, his communications with the boss of the organization were conducted exclusively by way of the boss's Blackberry Messenger (BBM) account, the pin number of which the CI provided to Lavoie and LeVangie. The CI explained that each Monday since he had arrived in Boston, he would receive a "burner" phone or BBM text message directing him to proceed to a hotel in the Boston area and take possession of a suitcase or duffel bag typically containing 10 to 20 kilograms of cocaine. The suitcase would be delivered to the hotel by a courier who would travel to Logan Airport on a Monday flight from San Juan, Puerto Rico, usually arriving between noon and 2:00 p.m. The CI stated that he had picked up a total of 90 kilograms of cocaine from different couriers following this *modus operandi* since the time he arrived in Boston six weeks earlier.

On or about Monday August 1, 2016, the CI showed officers a text message he had just received on his personal cell phone. It read: "The inn at cristal [sic] cove on boston harbor 600 shirley st winthrop ma." Dkt #70-1 at 9. Officers immediately began surveillance of the Inn at Crystal Cove (Inn). The officers learned from the staff at the Inn that Estela-Vazquez and

3

a third defendant, Carlos Torres (who is not party to the instant motion), had checked in to room 218 for a two-day stay.  Estela-Vazquez had registered at the Inn giving a home address in Puerto Rico.  He also sold the Inn staff that he was expecting a friend later that day who was coming to retrieve a package.

At 6:04 p.m., Estela-Vazquez and Torres were observed leaving the Inn and strolling up Shirley Street appearing to watch the oncoming traffic.  At 6:12 p.m., a 2004 Honda Pilot driven by Alicea pulled into the Inn's parking lot.  Estela-Vazquez walked briskly back to the parking lot and nodded to Alicea who was sitting in the open hatchback area of the Honda Pilot.  While Torres kept an eye on street traffic, Estela-Vazquez entered the Inn and returned wheeling a large roller suitcase, which he and Alicea loaded into the rear of the Honda Pilot. As Alicea drove away from the Inn, surveillance officers followed him through East Boston onto Route 145.  At the direction of Sgt. Marron, a uniformed State P0lice officer, Trooper James Farrell, ordered Alicea to pull over.  The roller suitcase was eventually removed from the Honda Pilot and found to contain 20 white bricks (later determined to weigh 21.55 kilograms) of a substance that field tested positive for cocaine. Alicea was then placed under arrest.[2]

---

[2] The events immediately surrounding the stop are the only facts in dispute. The surveillance officers claim that Alicea "rolled through" three stop signs before Trooper Farrell signaled him to stop.  Alicea denies committing any traffic violations prior to the stop.  Alicea states that he

4

## RULINGS OF LAW

*Carroll v. United States*, 267 U.S. 132, 158-159 (1925), carved an "automobile exception" out of the warrant requirement of the Fourth Amendment. *Carroll* recognized the exigency inherent in vehicular mobility as well as the impracticalities involved in obtaining a warrant after a vehicle is stopped.[3]

> [T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and

---

pulled over immediately when Farrell ordered him to do so and produced a valid driver's license and registration and insurance papers at Farrell's request. Alicea states that despite a check by Farrell that showed that his driver's license, registration, and insurance were in good order, Farrell locked him in the back of his cruiser for 10 to 15 minutes until a K-9 unit arrived. Sgt. Marron states in his report that the K-9 ("Rocky") alerted to the presence of drugs in the Honda Pilot; Alicea avers that he saw no change in Rocky's behavior as he approached the vehicle. Finally, Alicea states that he observed Farrell break open the lock on the suitcase with a cutting tool, a fact that the officers do not contest. While there are significant differences in the two accounts of the stop, as will be explained, none are material to a finding of probable cause to search the Honda Pilot. Hence, the factual discrepancies need not be resolved at an evidentiary hearing.

[3] More recent statements of the vehicle exception have emphasized the diminished expectation of privacy afforded by vehicles given their "public" nature and history of invasive regulation by the State. *See, e.g., Cardwell v. Lewis*, 417 U.S. 583, 590-591 (1974) (plurality opinion). This shift in focus is, however, of more possible relevance to defendant Estela-Vazquez than Alicea.

a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

*Id.* at 153.

An important extension of the automobile exception occurred in *Chambers v. Maroney*, 399 U.S. 42 (1970), which held that the existence of exigent circumstances is to be determined at the time the vehicle is seized rather than at the time it is searched. So understood, the Court found "no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." *Id.* at 52.[4]

The necessary predicate to a lawful warrantless search of a vehicle is, of course, probable cause. This is not an overly rigid or overly strict requirement. Probable cause means "reasonable cause," something

---

4 While the search of a seized vehicle should be conducted without undue delay, the word "immediate," as used in *Chambers*, does not mean "instantaneous." *United States v. Johns*, 469 U.S. 478, 484 (1985) (three day delay — "no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure").

significantly less exacting than "more likely than not" or "by a preponderance of the evidence." *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir. 1979). Probable cause "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion) (internal citation omitted). *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009) (probable cause is a fluid concept taking its substantive content from the particular circumstances – "the best that can be said generally about the required knowledge component of probable cause is that it raise a 'fair probability' or a 'substantial chance' of discovering evidence of criminal activity" (internal citations omitted)).

The existence of probable cause in this case rests on two essential premises advanced by the government: (1) that the CI was a reliable and credible source of information; and (2) that his predictions were corroborated by police surveillance prior to the stop of the Honda Pilot. Both premises are sound, as I will explain.

While the issue of informant reliability typically arises in the context of

the analysis of search warrant affidavits, where police rely on confidential sources to justify probable cause for a warrantless search, the rules for testing an informant's reliability are no different. *See United States v. Gonsalves*, 859 F.3d 95, 103-104 (1st Cir. 2017). A reviewing court is to give weight to the traditional factors of "veracity," "reliability," and "basis of knowledge," in a practical, common-sense fashion informed by a totality-of-the-circumstances analysis. *Illinois v. Gates*, 462 U.S. 213, 230, 232, 238-239 (1983).

In this spirit, when reviewing an informant's reliability, courts give positive weight to the following factors: (1) that police know the informant's true identity, *see United States v. Barnard*, 299 F.3d 90, 93 (1st Cir. 2002); *see also Commonwealth v. Love*, 56 Mass. App. Ct. 229, 234 (2002) ("The rationale for according more weight to the reliability of identifiable persons is that they 'do not have the protection from the consequences of prevarication that anonymity would afford' . . . and consequently may be subject to charges of filing false reports and risk retaliation."); (2) that the informant admits his own participation (declaration against penal interest) in criminal activity, *see United States v. Harris*, 403 U.S. 573, 583 (1971) (plurality opinion) ("People do not lightly admit a crime and place critical

8

evidence in the hands of the police in the form of their own admissions."); *see also United States v. Schaefer*, 87 F.3d 562, 566 (1st Cir. 1996) (same); and (3) that police are able to independently corroborate the accuracy of the informant's predictions, *see Alabama v. White*, 496 U.S. 325, 332 (1990) (the ability to accurately predict future behavior suggests access to reliable inside information); *see also Draper v. United States*, 358 U.S. 307, 313 (1959) (every prediction of the informant's detailed tip proved accurate).

All of these considerations apply here. The officers were fully aware of the CI's true identity (which has been disclosed to the court) and had established a face-to-face working relationship with him. The CI had confessed to them his responsibility for smuggling a life sentence's worth of cocaine. And every prediction he made, from the contents of the text message, to the timing and place of the delivery of the drugs, to the likely Puerto Rican origins of the drug courier, and the method and means of the delivery fell precisely in place.

Because probable cause had fully developed by the time that Alicea took delivery of the suitcase and drove out of the parking lot at the Inn, whether Trooper Farrell had an independent basis to order a stop (because of alleged traffic violations), or to seize the suitcase from the car (because of

9

the disputed K-9 alert) is immaterial.  *Cf. Sibron v. New York*, 392 U.S. 40, 77 (1968) (Harlan, J., concurring) ("[T]he prosecution must be able to date the arrest as early as it chooses following the obtaining of probable cause."). Also immaterial is the contention that Trooper Farrell delayed the seizure and the formal arrest beyond the time limits prescribed by *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  Under the *Chambers* rule, it is irrelevant whether the search was conducted immediately at the scene, later at the scene, or later at the garage where the vehicle was eventually impounded.  Finally, that Trooper Farrell broke the lock of the suitcase to reveal its contents is of no matter.[5]  "If probable cause justifies the search of

---

[5] The seizure of the suitcase raises the issue of whether Estela-Vazquez has standing to challenge its search.  The government, citing *United States v. Phillipos,* 849 F.3d 464, 469 (1st Cir. 2017) contends that he does not, as he has not filed a sworn statement claiming a possessory interest in the suitcase or Alicea's vehicle, nor has he proposed to testify to that effect at an evidentiary hearing.  Estela-Vazquez, for his part, argues that the federal rules (unlike their Massachusetts analog) require that he do neither and claims that he may simply rely on the government's pleadings (alleging that he was the source of the drugs) to join Alicea's challenge to the search.  *But see Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980) (a naked claim of ownership of drugs entrusted to another is insufficient to establish a reasonable expectation of privacy).   While Estela-Vazquez might be able to construct an argument based on a theory of a bailment, *see United States v. Benitez-Arreguin*, 973 F.2d 823, 827-828 (10th Cir. 1992), the government is correct that Estela-Vazquez has failed to meet his burden of showing both a subjective and objectively reasonable expectation of privacy in the contents of the suitcase.  *See United States v. Cruz Jimenez*, 894 F.2d 1, 5 (1st Cir.

a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982); *see id.* at 817-824 (under the vehicle exception, the search may extend to compartments of the car – the trunk, glove compartment, console, and engine area – whether locked or unlocked, and to containers, open or closed, that might conceal contraband or evidence of the suspected crime).

## ORDER

For the foregoing reasons, defendants' consolidated motion to suppress is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

1990) (defendant bears the burden of proving that he had [both] a subjective and objectively reasonable expectation of privacy). Because I agree that Estela-Vazquez does not have standing to challenge the search, I see no reason to delve more deeply into the government's alternative abandonment theory.